We will hear counsel in Pennsylvania Prison Society, Society of the Sacred. Please don't make me read the whole caption. Please don't make me read the whole caption. You are the representative of the Academy of Course Appeal. You are the representative of the Academy of Course Appeal. You represent the state. Well, we'll have to get into whether the Academy of Course Appeal. That's an understanding issue. Okay, so we have Mr. Winston. Are you representing all of the plaintiffs below? Is there a team going on in the Blue Jays? Is something coming through? What's happening? What do we hear? Do you mean that Josh Goss got the Blue Game on or something? No. Okay, well, it's all right. May it please the court, I'm Stephen Winston, counsel for the appellants. I represent the plaintiffs below in these cross appeals. With the court's permission, I reserve four minutes for rebuttal. And we gave you time, as you know. Correct. In this case, the court is being asked to determine whether the 1997 amendments to the Pennsylvania Constitution, which changed the commutation procedures for lifers and death sentence inmates, pass muster under the ex post facto and the due process clauses of the Constitution. Mr. Winston, I'm going to come to that quickly, by the way, okay? I'm going to ask you to focus right now on the standing issue. And in particular, on the standing of the two life sentence prisoners. Yes. Now, it's not clear to me. I see that one of those prisoners had at some point received a four-to-one recommendation for commutation, voted for commutation, right? I mean, that's in the complaint. Okay. And I assume that that's borne out someplace in the record, is that right? Yes, that is correct. Okay. Now, what I don't see in the record is any discussion or statistics as to the number of times a prisoner who requests a recommendation for commutation has been unsuccessful and ultimately successful. Because we know that, I know anecdotally from cases like that, that that happens. Yes. Do we have any statistics as to the number of first rejections and then finally approvals? It's not in the record per se, but it can be derived from documents that were produced during discovery where we were provided with the names of inmates who had applied for commutation and what the votes were on their applications over an extended period of time. I'm sorry, I don't understand that answer at its most basic level. Is it in the record before us? No. But you're representing that that has happened? Yes. And I don't think, I mean, I've been on this Court for more than 28 years, so from my own anecdotal knowledge, and Judge Clark has been on it longer than I, there have been situations where a prisoner has been denied and denied and denied and finally accepted. Is that right? Correct, Your Honor. And there are many reasons for that happening, one being the age of the prisoner, another being the medical condition of the prisoner, another being additional rehabilitative activities that the prisoner has been involved in. So there are a whole host of reasons, and there's no limitation in any of the Pennsylvania statutes, constitutions, or rules as to the number of applications for commutation that a prisoner may file. And some never get commutation. Most never get commutation. Commutation, as the statistics in the record indicate, commutation at one point was granted in 10% of all WIFRT cases, but in the 1990s, it was down to less than 1%. Well, would it be, well, I better ask the State, would it be appropriate for us to take judicial notice of the fact that there have been instances in which prisoners have been repeatedly denied, it's not commutation, because that depends on the governor, have been repeatedly denied recommendations and then ultimately, when it was a majority, ultimately got a favorable recommendation? Yes, and I think that's happened, that happened with Mr. Johnson, who's the prisoner plaintiff that you pointed to. And he, no, I'm sorry, Mr. Hollis, he received approval on one instance, on a 4-1 probe, but not on the other instance that he applied. So it depends, it depends upon the circumstances. On the other instance? Before or after? Where do we find that? Where do we find that? That's in the complaint in paragraph 12. I don't have the record citation for that, but it's in the complaint in paragraph 12. I have that. Plaintiff Hollis filed an application and received a vote of 4-1. It's 9, page 94 of the appendix. Back here. So he received, on one occasion he received a vote of 4-1. His recommendation was sent to the governor, but the governor rejected it. On another occasion, when he applied to the Board of Pardons, he did not receive a majority vote, so it didn't even go to the governor. Was that when the rule was majority? Yes. That was before the 97 change? That's correct. That's correct. So these, I think the record indicates that because at least two of these plaintiffs were repeat appliers for commutation, it's fair to presume that they will apply again in the future. And there have been other instances where courts have looked at facial challenges to a law or a statute where someone had violated the law in the past and the court said, well, then he'll probably violate it in the future, vagrancy statutes being a prime example of that. And courts have allowed standing in that instance for purposes of a facial challenge. And the whole concept of a facial... Mr. Winston, let me interrupt you for a moment. This argument has not as yet, and I realize it early in the argument, not as yet surfaced a concern that is a great one to make. That is whether or not the constitutional provision which permits the governor to grant commutation is subject to the ex post facto law at all. Because if it is not, and I would like your answer to that, and I have found no case which deals with the distinction between the constitutional decree and the parole legislative decree. I granted you that the legislature provides for parole. There have been paroles that have been granted, just as the governor has granted commutations. But what impels the governor to grant a commutation if he is not subject to the ex post facto? If in fact that is the case... Nothing compels me, though. Have you distinguished between the two of them in your brief? Nothing compels the governor to grant commutation. Can the constitution of Pennsylvania provide that the governor may not grant commutation of any sense? That is of course not the case before us, but we would argue the answer to that in the case of life without parole and capital cases, the answer to that would be no. But that is not the case before us. Here we have a remedy... I didn't understand your answer. Could the constitution provide that the governor has no right to grant commutation in the case of life sentence prisoners or death sentence prisoners? Our position would be the constitution could not provide that. It could not. But that is not the case before us. We know that, but you're being asked the question. It is the case, is it not, that under the constitution the prisoner must first go to the board of pardons where they hold a public hearing and then only after the board of pardons and the public hearing can there be a recommendation to the governor for commutation which the governor need not accept. I am correct in that, am I not? You are. I'm wrong. No, you are correct. You are correct. Oh, I beg your pardon. That being the case, how do you say that the constitution that the people, the populace in Pennsylvania that want to deprive the government of any commutation right, why do you say that they cannot do so? Because it would be our, if that were the issue in front of the court, it would be our position that allowing a release valve, a safety valve in cases of life without parole and death penalty cases is essential to those punishments being constitutional. And I would point the court to the decision of the only case that I'm aware of where that issue was presented was the case of Miller v. Morden, a decision by the Nevada Supreme Court in 1996, 921 P. 2nd. 882. There, the Nevada legislature in 1995 enacted a law eliminating the power of the pardons board to commit sentences of life without parole. The Nevada Supreme Court said that could not be done as an ex post facto issue. Absolutely foreclosing, and I'm quoting the court now, absolutely foreclosing a real, albeit rare avenue of release to all prisoners serving sentences of life without parole for the crime of first degree murder creates more than the speculative or attenuated risk of increasing the penalties for this covered crime. So the court refused to apply that, at least for an ex post facto determination. Now, we have a situation here in Pennsylvania where there is a remedy, and the remedy existed at the time that people were convicted. That remedy has been changed, and the circumstances under which commutations can be granted has been greatly narrowed. And these cases, and there are cases like this in the context of parole, and in the context of parole where courts have evaluated for ex post facto violations, different regulations or statutes which have changed parole criteria, that was Mickens-Thomas in this court, or reduced, I'm sorry, expanded the time between parole applications, and therefore limited the opportunities of prisoners to apply for parole. You have to establish before us, do you not, I think you have the verb, that even if Mr. Johnson had a 4-1 by the parole court, which comes after the governor's commutation, that that constitutes an additional punishment that was not in effect at the time that he was convicted. Am I right? I did not follow that, I'm sorry. I think what we have... In order to give Mr. Johnson standing, as I understand it, you have suggested that he had received a 4-1 vote of the parole court, am I correct? Of the Board of Pardons. Not the parole court. Board of Pardons. That he had received that vote, and you would have to establish before us that that means a diminution of his punishment, am I correct? No, what we would have to establish, and I believe what we have established, is the fact that before 1997, the 4-1 vote would have put his file on the desk of the governor, whereas today the 4-1 vote would not put the file on the desk of the governor. But ultimately, don't you have to show that the 1997 amendments created a significant risk of increased punishment? That is correct. We believe we have shown that. That is the classic Supreme Court definition of one of the elements of an ex post facto demonstration, and it's a risk. We don't have to prove that any particular prisoner would have been released. What we have to show is an increased risk of punishment, and in particular, I would draw the court's attention to the Supreme Court case. How have you shown that, given the fact that commutation is so unlikely to be granted? Even if the board recommends it? We have shown it in terms of the statistics. Just as this court entertains statistical evidence in the Mickens-Thomas case, and recognized the fact that every other commuted lifer had been paroled, whereas Mickens-Thomas had not, the court used that to conclude that the addition of the public safety factor into the parole calculation constituted an adverse change and an increased risk of punishment. Here we have situations within the last ten years. We have five situations, five individuals, who received a less than unanimous vote from the pardons board, who the governor eventually commuted. Those people who are out on the street today wouldn't be out on the street under this new regulation. And if that's the difference between freedom and incarceration, if that's not an increased risk of punishment, then I don't know what is. This is a stark difference. Mr. Winston, doesn't the Lyons case in the Supreme Court require that there be a demonstration of a sufficient likelihood that the prisoner personally will sustain an injury? How does the fact that a vote of the pardon board, even though it was more than a majority, but without a commutation by the governor, support that sufficient likelihood? Because the pardons board vote is an essential element, an essential precursor to any commutation by the governor. The governor cannot exercise his power of commutation if there's no file on his desk. And the only way a file gets on his desk now is if there's a unanimous vote of the pardons board. Previously, files got to the governor's desk if there was a majority vote. And the record has demonstrated that there were cases where majority votes resulted in commutation. This is no different than the situation in Miggins-Thomas where the court acknowledged and stated that the court was dealing with one half of one percent of the lifer population who were in the same position as Mr. Thomas. So Miggins-Thomas was a parole case that did not involve the board of pardons. It was a parole case. It involved the parole board and it comes into effect only after there's been a commutation. Isn't it one board now, the board of pardons after all? Yes. Yes. That's my understanding at least. Well, we'll find out from Mr. Thomas. They play different roles under different circumstances. Go ahead, Mr. Thomas. No, I just pointed out that Miggins-Thomas is not, to my way of thinking, on point because that was a parole determination and not a pardon determination. No, I was on that case. I know that case pretty well. I spent a lot of time on that. They are both release mechanisms and that's the critical connection between the two. Go ahead, Leonard. One's constitutional, the other is legislative. Where it appears in the statute books doesn't make any difference. It could be regulation, it could be a statute, it could be a constitutional provision. So what court has found that it's applicable to a constitutional provision? I was going to ask that question at the beginning. I don't know that there has been any, that most states provide for commutation in their statute books as opposed to their constitutions. I think Pennsylvania is a rather unique situation in that regard. You are not making any claim, I gather, on behalf of prisoners who committed crimes after 1997, are you? The due process clause does apply to prisoners who committed crimes after 1997. Are you making any claims? Not in this case. Yes. We have appealed the dismissal of the due process claim which would apply irrespective of when the conviction occurred. That is fact, though, aren't it? That is correct. And the district court never reached the due process claim? No, the district court dismissed most of the elements of the due process claim and left us only with decision-maker bias with regard to one member of the pardons board, as to which it eventually granted some adjustment for the defense. Leonard, do you have any more questions? No, I do not. Thank you. On rebuttal. Good morning, Your Honors. Judge Garth, can you hear me? Hello, Judge Garth? She asked if you can hear her. I guess not. I have a difficult hearing. Okay, I will try to talk up. I'm sorry. May it please the Court, I am Amy Zapp. I'm with the Office of Attorney General and I'm appearing here for the defendants in the district court who are now at the lease and on behalf of the cross-appeal of the Attorney General. Let me say right away, and I should tell Mr. Winston this too, we will not have a separate argument on the cross-appeal. We never do. We don't want people to jump up and down. We don't want to be seen as an appellee but as putative appellant. And then Mr. Winston in his reply should also include that so that everybody understands. You're not going to get another chance. I've been here before, Your Honor. I know. That's been my rule ever since I found out about my colleagues. Okay. If I can begin with a point to clarify in response to Judge Slobart's question. And I think Judge Garth may have had some questions along this line as well. The Board of Pardons is an entity completely separate from the Board of Probation and Parole. The Board of Pardons is a constitutional entity in Pennsylvania. And that is a separate and completely different function than that performed by the Board of Probation and Parole. That is a legislatively created entity as Judge Garth, I think, observed in response to one of the questions. They are two very different animals. And that is an important point that I wanted to stress and is responsive to some of the issues that have been raised here. We believe the district court got off on the wrong foot here. In the initial stages of this litigation when things were initially addressed after the matter returned from the state courts, we pointed out that the fight over ex post facto claims related to the pardons function here really does not, it really does not exist. And it should have been dismissed out of hand. Because the traditional measure of any ex post facto claim is whether or not whatever it is that's being disputed has increased the punishment for which the person who was convicted had exposure at the time of the sentence. None of the plaintiffs in this situation has been affected negatively in terms of his sentence. Why do you say that? Because the file never got to the governor's desk as a result of the change in the 1997 change in the Constitution. So he's been affected because it didn't get there. No, he hasn't. To figure out whether or not he has exposure at the time of the sentence he had under the law. At the time, what the crimes code of Pennsylvania specified as punishment for his crime. And in this situation, as filed, you had a prisoner sentenced to death and two life sentenced prisoners. The term was natural life for the life sentenced and that over the course of the years ultimately been granted commutation of their life sentence. So it's not possible to say on the statistics in this record that a life sentence always means life. But Your Honor, what you're confusing here is this. You are reading that as an alteration of their sentence. That is a forgiveness of their sentence. That's a different channel. Excuse me, and this is an attempt to clarify. Do I understand your position to me that from a constitutional standpoint, from an ex post facto standpoint, that a diminution in the statistical probability of a grant of clemency is not the same as an increase in sentence? Precisely. Right. In fact, it has nothing, one has really nothing to do with the other. But the practical effect is the same. The fact is that people who have life sentences have in fact been released  So whatever you call it, the practicalities are that before they had a possibility of being released, maybe small, infinitesimal, but a possibility maybe not probability but possibility and after the change, they don't. And I don't know what difference it makes if you use the fancy language of my colleague because that happens. I'm just a country boy. Yeah, I know you're a country boy. I've been a country boy for a long time. I'm just a country boy. But with respect, Your Honor, what you call is critical error and that's our concern. Whether they can get out or not is critical, not what you call it. But how you get out, Your Honor, whether you've given a lawful sentence that has not been altered is what the difference is. And this is what we are saying. This is why we're saying that there were problems with what the district court did. And I apologize. I don't mean to make this thing keep making noise. But if I may go back to something on the standing issue, because I think it's important. Something I just learned yesterday that I think we need to take into account. And I apologize for this,  who is listed as the representative death sentence prisoner, is no longer under death sentence. Is that? May I interrupt you for a minute? Yes, sir. No, that's important. Did you hear that? I didn't, that's why I want to hear it. Roger Buell, who is listed in the complaint as a prisoner under a sentence of death, is no longer under a sentence of death. Why? What happened? Well, this court affirmed a district court's ruling allowing him to have a new penalty phase. And he went back to the Montgomery County court of common pleas and was resentenced to life. And I apologize. I just learned this yesterday. I should have, had I known it sooner, I would have alerted the court to that. Now, that's okay. So that means that his claim on behalf of death penalty prisoners is moot. Well, if there ever was a claim, because my position is that there never was an actual injury here. We understand that. But if there was an injury, I would like you to write a letter to the court so that we have that in writing. I was going to propose to do that, Your Honor, because I think also what's critical here is when that happened. I'm still a little confused. I looked at the court dockets and I can't say exactly when that happened. Okay. I apologize again. I was trying more slowly. So, Judge, will you come to Wolfe if we want to hear you? I apologize that we're getting this kind of feedback here and I'm trying to avoid it by staying out of the line of the microphone. But I apologize if you couldn't hear me. But what I was starting to say, Your Honor, was that I was agreeing with Judge Solipeter that we should send in a letter describing Mr. Buell's current status, what has happened in his case. And I think it's important that we see when it happened. No, it isn't. It's just important that it happened because in the case of mine that went to the Supreme Court in the United States very, very long ago, they took cognizance of something that had happened even after our decision. So I think that we can, for mootness purposes, take cognizance of subsequent events, as long as it's on the record. But what I'm trying to say, Your Honor, is too, I think it goes beyond mootness. I think it goes to life case or controversy possibly because if Mr. Buell was resentenced prior to the reactivation of this lawsuit in the federal court, there was never an actual case or controversy involving him. But what matter if it's moot? Why don't you go on to something else? Beyond that, Your Honor, as I said, the distinction here between parole and pardon, the different functions is important because they are not  I know you're familiar with the Thomas ruling. And very clearly, you have a situation where parole works differently. Parole is part of the sentencing process in Pennsylvania and some other states where it basically sets the lower limit of incarceration because the law at the time of perservation allows for this possibility that you may be released from custody the day after you complete serving your minimum sentence for everybody except lifers and death sentence prisoners. So you have a situation where arguably if something is done to tinker with that, you may potentially have ex pro facto complications. And when I say that, I'm going to be very careful and point out that our Supreme Court in Pennsylvania has taken a slightly different view on this subject. And when ex pro facto purposes look like... Could you slow down please? I'm sorry, I'm not trying to... No, no, you're not going to get there if you talk faster than we'd like to hear you. I apologize. What I was saying was that I would allow the theoretical possibility that altering parole-related procedures may potentially lead to ex pro facto complications. Because if you alter them in ways that may make it... You may make it... You may make it a possibility that somebody is actually going to serve more time than they were initially sentenced to because the statute was interpreted differently at the time that they committed their crime. Depending on what rules or regulations are enacted, you might potentially have that problem. Pardons are different situations. You don't have a pardon figuring in the sentencing process. It's a completely separate, parallel decision process. And that's  you don't have... I'm sorry? Would you just concentrate for just a moment on the pure standing issue? I am primarily interested in that. Your brief states that there is no standing for any of the plaintiffs. I would like you to address that in terms of what the standing requirements are, why they haven't been met, and what should be done in connection with it. Your Honor, the standing requirements under Article 3 require... And please talk into the microphone, not on the side of it. Thank you. The Article 3 requirements require that a plaintiff have an actual injury, that there be an imminent concrete harm to that individual who seeks to participate in litigation. In this case, we don't have that for any of the named plaintiffs. First of all, as a group, we have some taxpayer citizens plaintiffs, and they don't have standing. They don't... Let's talk about the prisoners. I think maybe they have the strongest claim. But at least in the... Read Judge Clark. Go ahead. And the three prisoners here don't have standing because none of them have been affected by these provisions or have indicated that it's actually likely that they will do that. Would you comment on the effect of the Supreme Court's decision in Adirond on standing? Adirond? That's a Supreme Court decision in 1995 that held that the subcontractors had standing even though I think it was their bids weren't accepted. We, therefore, must ask whether Adirond had made an adequate showing that sometime in the future it will bid on another government contract that offers financial incentives to a prime contractor for hiring this advantage. You don't know? If you don't know, Adirond, you can't comment. I don't, Your Honor, and I apologize. Well, it's a Supreme Court decision on standing. I know, and I looked at the case. I might bring your attention, Judge Slaugher. I might bring your attention that I was on the Tenth Circuit panel that went  Supreme Court on that case. Really? So you know about it. Yes. The question is, does Ms. Adirond know about it? I do not. Off the top of my head, I cannot recall reading that case. We did, as I say, as I indicated in our brief, look at a lot of other cases and have cited the Court to them. If it's any solace, I only remember the name of the case, Ms. Adirond. There are two experts on the case. One of them is Mr.  Mr.     the  Court. He was a member of the Supreme Court. He was a member of the Supreme Court. He was a member of the  Court.  has been a member of the Supreme  for many  I cannot remember his name. I do not remember him being the most important member of the Supreme Court. I do not remember not remember him being  most being the most important  of the Supreme Court. of the Supreme    not remember him being    him being the  important member of the  most  member of the Supreme him being the most  member of the Supreme Court. I do not remember him being the most important member of the Supreme Court. I do           Court. I do not